IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

UNITED STATES OF AMERICA,

No.  3:07-cr-492-HZ

          Plaintiff,

    v.

OPINION & ORDER

ROBERT VINCENT MENDEZ,

         Defendant.

S. Amanda Marshall
UNITED STATES ATTORNEY
District of Oregon
Kemp Strickland
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

     Attorney for Plaintiff

/ / /

/ / /

1 - OPINION & ORDER

Ernest Warren, Jr.
WARREN & SUGARMAN
838 S.W. First Avenue, Suite 500
Portland, Oregon 97204

  Attorney for Defendant

HERNANDEZ, District Judge:

  Defendant Robert Mendez moves to dismiss the indictment charging him with four

counts of bank robbery.  He also moves to suppress statements he made during questioning.  An

evidentiary hearing was held on June 26, 2012.  I deny the motions.

BACKGROUND

  Defendant was arrested in Tacoma, Washington on November 21, 2007.  He was indicted

in the District of Oregon on December 4, 2007.  Dkt #1.  The indictment charged him with four

counts of bank robbery, all occurring in November 2007.

  Defendant was indicted on separate bank robbery charges in the Western District of

Washington on March 13, 2008.  Ex. A to Deft's Mem. in Supp. of Mot. to Dismiss No. 1

(Western District of Washington Docket Sheet for case number 3:08-cr-5174 showing indictment

for bank robbery filed on March 13, 2008).  Defendant was arrested on the Washington bank

robbery charges on March 17, 2008.  Id.  On that same day, he was arrested on the Oregon

indictment.  Gov't Ex. 1 to Gov't Resp. to Mots to Dismiss (Docket Sheet for Western District of

Washington case number 3:08-mj-5057).  Pursuant to Federal Rule of Criminal Procedure

5(c)(3)(D), defendant made his initial appearance on the Oregon indictment on March 17, 2008,

in Washington, and at that time, he was advised of his rights.  Id. (showing minute entry for

initial appearance, appointment of counsel, advisement of rights all in relation to the Oregon

2 - OPINION & ORDER

indictment).  Defendant was ordered detained on the Washington indictment.  Id.

On April 14, 2008, defendant executed a waiver of a Rule 5 hearing on the Oregon

indictment.  Id.  Defendant was ordered to be held in Washington until completion of his

Washington case.  Id.  The Magistrate Judge signed an Order of Transfer requiring that defendant

be transported to the District of Oregon at the conclusion of the Washington case.  Id.

On January 29, 2009, the United States Marshal's Service confirmed via email that it

would transport defendant to Portland after he was sentenced in the Washington case.  Gov't Ex.

2 to Gov't Resp. to Mots to Dismiss.  On June 15, 2009, defendant and his attorney signed a Rule

20 Consent to Transfer his Oregon case to the Western District of Washington.  This document

was filed in the Western District of Washington in case number 3:09-cr-5507, on July 24, 2009.

Gov't Ex. 3 to Gov't Resp. to Mots to Dismiss.

On August 24, 2009, defendant pleaded guilty to one count of the Washington bank

robbery indictment.  Ex. A to Def's Mot. to Dismiss No. 1 (Washington Docket Sheet in case

number 08-cr-5174).  At the same time, he withdrew his consent to the Rule 20 transfer of

jurisdiction.  Id.  The Oregon documents were ordered returned to Oregon.  Defendant was

sentenced in the Washington case on November 20, 2009.  Id.

On October 19, 2011, the United States Attorney for the District of Oregon filed a writ

pursuant to 18 U.S.C. § 3621(d), requesting that the Marshal transport defendant to the District

of Oregon.  On November 7, 2011, defendant made his first appearance in the District of Oregon

and was arraigned on the Oregon indictment.  He was ordered detained and a January 10, 2012

trial date was set.  His first motion to dismiss based on Speedy Trial Act violations, was filed on

December 27, 2011.  Since then, he has changed lawyers and filed additional motions.  A new

3 - OPINION & ORDER

case schedule has been set.  Additional relevant facts are recited below.

I.  Motion to Dismiss - Speedy Trial Act

  The Speedy Trial Act, 18 U.S.C. §§ 3161-3174, provides that a criminal defendant's trial must normally commence within seventy days of the filing of the indictment or the defendant's initial court appearance, whichever is later. 18 U.S.C. § 3161(c)(1).  Certain periods of delay are excluded from the calculation of the seventy-day limit, including delays resulting from any proceeding related to the transfer of a case from another district.  18 U.S.C. § 3161(h)(1)(E).

  A.  Commencement of the Speedy Trial Clock

  Defendant argues that he first appeared and entered a not guilty plea on the Oregon indictment on April 14, 2008[1], starting the speedy trial clock at that time.  He expressly concedes that during the time he agreed to a Rule 20 transfer of the Oregon charges to Washington, the speedy trial clock was tolled, and continued to be tolled during the time he negotiated "the matter in that jurisdiction."  Def's Mot. to Dismiss No. 1 at p. 5.  But, he contends, even excluding that time, the time between his first court appearance and November 7, 2011, when he first appeared in person in the District of Oregon, was over 717 days, well beyond the ten days allowed under section 3161(h)(1)(F) for transportation of a defendant from one district to another.[2]

---

 [1]  The record is a bit murky, but, as noted in the Background section above, defendant appears to have made his initial appearance on the Oregon charges on March 17, 2008.

 [2]  Judgment in the Washington case was filed November 20, 2009.  There are 718 days between that date and the date defendant appeared in the District of Oregon on November 7, 2011 (including November 7, 2011).  By referring to "more than 717 days," defendant appears to concede that all of the time from his first appearance on the Oregon indictment (whether it be March 17, 2008 or April 14, 2008) to the conclusion of the Washington case on November 20, 2009, is excludable, even though he only expressly mentions the time when the Rule 20 transfer motion was pending and the time required to negotiate the conclusion to the Washington case.

Defendant's argument is premised on the assumption that the speedy trial clock began when defendant made his initial appearance on the Oregon charges in Washington (either March 17, 2008 or April 14, 2008).  The Speedy Trial Act is clear that "[i]n any case in which a plea of not guilty is entered, the trial of a defendant charged in an . . . indictment . . . shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs."  18 U.S.C. § 3161(c)(1) (emphasis added).  Thus, the clock starts with the latter of two dates:  (1) the date of the indictment; or (2) the date of the initial appearance.  Because defendant's first appearance on the Oregon indictment came later than the date of that indictment, the date of his first appearance is the date that starts the speedy trial clock.  The issue in this case is whether defendant's first appearance on the Oregon indictment in Washington actually started the clock, or whether his first appearance on the Oregon indictment is not considered to have occurred until he was physically present in Oregon on November 7, 2011.[3]

Both parties discuss United States v. Wickham, 30 F.3d 1252 (9th Cir. 1994).  There, the defendant was charged in the Central District of California with escape from custody.  He was arrested in Texas.  The next day, he appeared before a magistrate judge in the Northern District of Texas, initially electing to waive a removal hearing and have the preliminary hearing held in Los Angeles.  Then, he changed his mind and decided to plead guilty to the California charge in Texas pursuant to Rule 20.  He signed a Consent to Transfer form.  That form, and the

---

[3] Defendant makes no argument that there are any speedy trial concerns after November 7, 2011.

information, were filed in the Central District of California and the case was transferred to the

Northern District of Texas.  On November 15, 1991, the defendant pleaded guilty to the

California escape charge which had been transferred to Texas.  On January 29, 1992, the

defendant moved to withdraw his guilty plea.  On February 12, 1992, the district court in Texas

granted that motion and ordered the defendant transferred to California for prosecution.

The defendant arrived at a detention center in Los Angeles on February 27, 1992, and first

appeared in federal court in the Central District of California on April 21, 1992.  He was

arraigned on May 4, 1992 and a trial for June 9, 1992 was set.  He then moved to dismiss for

violation of the Speedy Trial Act.  The district court denied the motion.

The Ninth Circuit explained that although the defendant's indictment date was adjusted

under section 3161(i) to February 12, 1992, the Speedy Trial Act provides that the "clock does

not begin to run until the later of the date of indictment or the date the defendant appears in the

charging district." Id. at 1254.  The relevant date, therefore, for determining the start of the

speedy trial clock in Wickham was not the adjusted indictment date, but the April 21, 1992 date

when the defendant first appeared in the Central District of California, "the district in which the

charge was pending." Id.  Because the time between April 21, 1992 and the June 9, 1992 trial

date was less than seventy days, there was no violation of the Speedy Trial Act requiring

dismissal of the indictment.  Id. at 1255.

Defendant here argues that Wickham is distinguishable because (1) there is no indication

in Wickham that the defendant was formally arraigned on the out-of-jurisdiction indictment in

Texas, whereas here, defendant was arraigned on the Oregon charges in Washington in 2008; and

(2) here, there is an "extraordinary length of delay" for which there is no justification.

6 - OPINION & ORDER

In response, the government states that defendant was not arraigned in Washington on the Oregon charges, making the case indistinguishable from <u>Wickham</u>, and that in any event, defendant fails to offer any authority to support his position that a formal arraignment in a non-charging district starts the speedy trial clock. I agree with the government.

The Western District of Washington Docket Sheet for the Oregon charges shows that defendant made an appearance on March 17, 2008 in a "Rule 5(c)(3) proceeding." Gov't Ex. 1 to Gov't Resp. to Mots to Dismiss (Docket Sheet for case number 3:08-mj-5057 (noting Oregon District Court case number CR-07-492-KI as "other court case number")). Federal Rule of Criminal Procedure 5(c)(3) outlines the procedures used by a district court for an initial appearance occurring in a district other than where the offense was allegedly committed. The docket shows that no arraignment under Federal Rule of Criminal Procedure 10 occurred at that time. <u>Id.</u> At an April 14, 2008 hearing, defendant waived a Rule 5 hearing and the Magistrate Judge signed an Order of Transfer requiring transfer of defendant to Oregon at the end of the Washington case. <u>Id.</u> There is no indication that defendant was arraigned on the Oregon charge at this time. <u>Id.</u> The Western District of Washington Docket Sheet for the Washington charges also shows no indication that defendant was arraigned on the Oregon charges at any time. Ex. A to Def's Mot. to Dismiss No. 1. Thus, the record does not support defendant's attempt to factually distinguish <u>Wickham</u>.[4]

Additionally, I agree with the government that without any additional authority from the

---

[4]  A handwritten comment on Docket #5 in the instant case, which appears to be the return of the executed arrest warrant, states as follows: "subject arrested by FBI Tacoma 3/17/08 on their bank robbery charges - arraigned on our D/OR warrant 4/14/08." Given the actual record in the Western District of Washington, it is apparent that this unidentified handwritten entry regarding an arraignment is a mistake.

7 - OPINION & ORDER

Ninth Circuit or other courts, Wickham controls, even if one assumes that defendant was arraigned in the Western District of Washington on the Oregon charges. The plain language of the statute provides, as relevant here, that the speedy trial clock starts from "the date the defendant has appeared before a judicial officer of the court in which such charge is pending[.]" 18 U.S.C. § 3161(c)(1). The district in which the charge is pending is the District of Oregon. Defendant did not appear before a judicial officer of this district until November 7, 2011.

As to defendant's alternative argument regarding the extraordinary delay here compared to Wickham, nothing in Wickham suggests that the length of delay alone is determinative of a Speedy Trial Act violation. Moreover, because the Speedy Trial Act clock did not start until November 7, 2011, there is no "extraordinary" Speedy Trial Act delay to consider. While the delay here may raise a separate Sixth Amendment speedy trial violation, there is no violation of the seventy-day clock in section 3161(c)(1).

B. Section 3161(j)(1) - Delay by Government Attorney

Defendant appears to make a separate argument under section 3161(j)(1)[5] which provides that if the attorney for the government knows that a person charged with an offense is serving a term of imprisonment in any penal institution, the attorney shall promptly undertake to obtain the presence of the prisoner for trial or cause a detainer to be filed with the person having custody of the prisoner and request that the prisoner be advised of his right to demand trial. The government argues that no violation of section 3161(j)(1) occurred because after defendant was

---

[5] It is unclear to what extent defendant relies on this argument because although defendant cites to section 3161(j)(1) in the beginning of his motion, he never mentions it in the "argument" section. Out of an abundance of caution, I address the argument.

indicted, the government requested an arrest warrant and detention.  After arrest, a detainer was

placed on defendant while he was incarcerated in the Western District of Washington.  The

Magistrate Judge advised defendant of the nature of the charges and entered an order that further

proceedings be conducted in the District of Oregon and that defendant be transported to Oregon.

The government states that due to what can be described as "administrative errors" surrounding

defendant's Rule 20 waiver and subsequent withdrawal, the warrant of removal was not executed

after the Washington sentencing.  When the government learned that defendant had not been

transferred, it filed a writ to bring him to this district.

Neither party cites any cases addressing whether these facts constitute a violation of

section 3161(j)(1).  In the end, defendant's argument is unavailing as a basis to dismiss the

indictment.  The Ninth Circuit has expressly held that dismissal of the indictment is <u>not</u> a remedy

for a violation of section 3161(j)(1).  <u>United States v. Valentine</u>, 783 F.2d 1413, 1415, 1416 (9th

Cir. 1986) ("[t]he language of the Speedy Trial Act clearly dictates that dismissal of an

indictment is not a remedy for a violation of § 3161(j)(1)"; noting that "a violation of §

3161(j)(1) may subject the prosecuting government attorney to fines, suspension or the filing of a

report with a disciplinary committee").  Thus, I  need not resolve whether there is a violation of

section 3161(j)(1) because the only remedy requested by defendant is dismissal of the indictment

which is not allowed under the statute.

II.  Motion to Dismiss - Sixth Amendment

In addition to the statutory right, defendant has a Sixth Amendment right to a speedy trial.

<u>United States v. Sutcliffe</u>, 505 F.3d 944, 956 (9th Cir. 2007).  In order to trigger the right to a

speedy trial evaluation under the Sixth Amendment, the defendant must show "that the period

9 - OPINION & ORDER

between indictment and trial passes a threshold point of 'presumptively prejudicial' delay."
United States v. Beamon, 992 F.2d 1009, 1012 (1993) (quoting Doggett v. United States, 505
U.S. 647, 652 (1992)).

If the defendant passes the threshold test, the court must undertake a four-part balancing
inquiry consisting of the following factors:  "'(1) whether delay before trial was uncommonly
long, (2) whether the government or the criminal defendant is more to blame for that delay, (3)
whether, in due course, the defendant asserted his right to a speedy trial, and (4) whether he
suffered prejudice'" because of the delay.  Beamon, 992 F.2d at 1012 (quoting Doggett, 505 U.S.
at 650); see also Barker v. Wingo, 407 U.S. 514, 530 (1972) (listing the four factors which are
often referred to as the "Barker inquiry").

Defendant notes that he has been in federal prison or custody for over four years, with a
March 2008 arrest on the Oregon charges, knowledge by the government that he withdrew his
Rule 20 consent as of August 28, 2009, and the conclusion of his Washington case on November
20, 2009.  Yet, despite the government's knowledge of his unresolved Oregon charges, the
government did not bring him back to the District of Oregon for prosecution until November 7,
2011.  He states that he has consistently asserted all of his rights, including his right to a speedy
trial.  He contends that the delay in prosecuting him has prejudiced him because he may receive
an eight-year consecutive sentence.  He also contends that the delay has impaired his ability to
prepare a defense and caused him anxiety.

The time between defendant's December 2007 indictment and his first appearance in the
District of Oregon on November 7, 2011, is almost four years.  This meets the "presumptively
prejudicial" threshold.  Doggett, 505 U.S. at 652 n.1 (noting that delays between and indictment

and trial of about one year are considered "presumptively prejudicial"); United States v.

Mendoza, 530 F.3d 758, 762 (9th Cir. 2008) ("Generally, a delay of more than one year is

presumptively prejudicial").

The second factor examines whether the government or the defendant is more responsible

for the delay.  Here, the reasons for the delay fall into two categories, split by the date of the

judgment in the Western District of Washington case.  While the total time at issue from

indictment in December 2007 to his appearance in Oregon in November 2011 is almost four

years, defendant cannot reasonably argue that the time he was incarcerated in Washington before

his sentencing and judgment on November 20, 2009 is attributable to any fault by the

government.  During the time his case was pending in Washington, defendant waived his speedy

trial rights in the Washington case several times, all while knowing that his Oregon charges were

to be resolved in Oregon after the conclusion of the proceedings in Washington.  Ex. A to Def's

Mot. to Dismiss No. 1 (Washington Docket Sheet in case number 08-cr-5174 showing waiver of

speedy trial rights on numerous occasions).  There is no question that defendant bears

responsibility for any delay between the December 2007 indictment and the November 2009

sentencing and judgment in the Washington case.

As to the delay commencing in November 2009 and continuing until November 2011, the

government bears full responsibility.  However, there is nothing to indicate that the delay was

caused by anything other than negligence and perhaps confusion regarding the Rule 20 transfer

which was later rescinded.  Barker asks whether the government or the defendant is more to

blame.  Vermont v. Brillon, 129 S. Ct. 1283, 1290 (2009).  Also, "different weights should be

assigned to different reasons," with any "deliberate attempt to delay the trial in order to hamper

11 - OPINION & ORDER

the defense weighted heavily against the government," a "more neutral reason such as negligence or overcrowding weighted less heavily," and a "valid reason, such as a missing witness," justifying appropriate delay.  Barker, 407 U.S. at 531.

Accordingly, on the second factor, the first two years of delay weigh against finding a speedy trial violation, while the next two years are neutral or weigh slightly against the government/in favor of defendant.

The third Barker factor looks at whether defendant asserted his right to a speedy trial.  As noted above, during the time defendant's case was pending in the Western District of Washington, defendant waived his speedy trial rights several times, often in the context of requesting a continuance of the trial or a motion to withdraw counsel.  An assertion of speedy trial rights after requesting continuances does not weigh in favor of finding a speedy trial violation.  United States v. Corona-Verbera, 509 F.3d 1105, 1116 (9th Cir. 2007).  Thus, at least until November 20, 2009, this factor weighs against defendant.

As to the period after his Washington case concluded, the government argues that defendant fails to establish any assertion of his speedy trial rights until he appeared in Oregon in November 2011.  In his memorandum in support of his motion, defendant states that he "asserted his right to a Speedy Trial through his attorney's [sic] on occasions that are of record."  Def's Mem. in Supp. of Mot. to Dismiss #2.  But, he fails to cite to any particular evidence in the record, and, as noted above in regard to the period before the judgment was entered in the Washington case, defendant waived his speedy trial rights several times.

In support of the motion, defendant relies on a January 13, 2011 "Detainer Action Letter" to the United States District Court for the District of Oregon from a Correctional Systems Officer

at the federal penitentiary in Coleman, Florida.  Def's Ex. 103.  The letter states that the Bureau

of Prisons was in possession of defendant's presentence report which indicated that there were

pending charges in the District of Oregon.  Id.; see also Def's Aff. at ¶¶ 2-3 (noting that while he

was an inmate at the United States Penitentiary in Coleman, Florida, he met with a case manager

who told him that, in expectation of defendant's release date within two years, the case manager

had written to the District of Oregon requesting that the District of Oregon place a detainer on

defendant to face the pending charges here).   The letter explained that if the District of Oregon

wanted a detainer placed on defendant, it had to send a certified copy of the warrant and a cover

letter to the Bureau of Prisons.  Id.  According to defendant, the case manager reported that no

response was received.

On June 9, 2011, defendant wrote to the Clerk of the Court for the District of Oregon,

seeking information about the charges.  Def's Ex. 104 [6]; see also Def's Aff. at ¶ 4 (describing

letter).  In the letter, defendant states that he believed that the Oregon charges had been resolved

in the District of Washington under Rule 20.  Id.  If the charges were not, in fact, resolved, he

requested that he be brought to the District of Oregon to address them because the pendency of

the charges precluded his release to a halfway house or to home detention.  Id.  In his affidavit,

defendant states that he received no response to his inquiry.  Def's Aff. at ¶ 4.  However, on

November 1, 2011, he was transferred to Oregon.  Id. at ¶ 5.[7]

---

[6]  The original of this letter was placed in the chambers file of Judge King, the judge then assigned to the case.  At the June 26, 2012 hearing, I provided copies of the letter to counsel for defendant and the government.  Defendant subsequently filed the letter as Exhibit 104.

[7]  On June 26, 2012, I granted in part defendant's motion to compel and ordered the government to search records in possession of the United States Attorney in the District of Oregon for any correspondence by defendant, or anyone on his behalf, inquiring about

I do not consider the 2011 communications a "prompt" assertion of defendant's speedy trial rights given that they were made more than one year after the end of his Washington case. Additionally, the case manager, not defendant, initiated the process.  Defendant himself made no assertion of his speedy trial rights until June 2011 when he wrote to the District of Oregon requesting information about his case.  However, assuming the truth of defendant's statement that he did not know until early 2011 that the Oregon charges had not, in fact, been resolved, defendant's failure to affirmatively assert his speedy trial rights before that time is justified and should not be held against him.

Under the Sixth Amendment, "a defendant has some responsibility to assert a speedy trial claim[.]"  Barker, 407 U.S. at 529.  "The Speedy Trial Clause primarily protects those who assert their rights, not those who acquiesce in the delay - perhaps hoping the government will change its mind or lose critical evidence."  United States v. Aguirre, 994 F.2d 1454, 1457 (9th Cir. 1993); see also Doggett, 505 U.S. at 653 (where a defendant is aware of the indictment, but does not assert his right to a speedy trial, "Barker's third factor, concerning invocation of the right to a speedy trial, would be weighed heavily against him.").

I find this factor to be neutral.  During the first two years, from December 2007 to November 2009, the record shows that defendant expressly waived his speedy trial rights with the knowledge that his Oregon charges would not be addressed until the conclusion of his

---

defendant's charges in Oregon, and produce them to defendant.  Counsel for the government voluntarily expanded my order to include any documents in possession of the United States Attorney for the Western District of Washington.  On June 28, 2012, counsel for the government reported that no responsive documents had been found.  Other than the June 9, 2011 letter I located in Judge King's file, no other documents have been submitted to the Court by defendant or by the government.

Washington case.  While the waiver was directly related to a trial on the Washington charges, it is reasonable to apply the waiver equally to the Oregon charges.  During this period, this factor weighs in favor of the government.  During the second two years, accepting as true defendant's statement that he did not know the Oregon charges were still pending, there is no failure to assert his rights.  But, it is also the case that the government did not unreasonably delay in the face of an express assertion of speedy trial rights.  Thus, on balance, this factor is neutral.

The fourth factor asks whether the defendant suffered prejudice as a result of the delay. The threshold finding of presumptive prejudice is "part of the mix of relevant facts, and its importance increases with the length of delay." Doggett, 505 U.S. at 655–56.  The court must weigh the reasons for and the extent of the delay against the evidence of actual prejudice. Doggett, 505 U.S. at 656-58.  When the government has acted negligently, the "concern for substantiating prejudice diminishes as delay mounts." Beamon, 992 F.2d at 1013; see also Doggett, 505 U.S. at 657 (to warrant relief, "negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice.").

Defendant correctly notes that he need not show actual prejudice when a delay caused by the government's negligence is exceedingly long.  I find that defendant should not be excused from establishing actual prejudice in this case.  Again, it is important to note that the only delay for which the government can be held responsible began in November 2009.  Thus, I am primarily concerned with a twenty-four month delay, not a forty-eight month delay.  In Beamon, the court refused to find delays of seventeen or twenty months, caused by the government's negligence, sufficient to excuse evidence of actual prejudice.  992 F.2d at 1013-14.  The court noted that measured by the previous cases of Doggett and United States v. Shell, 974 F.2d 1035

(9th Cir. 1992), which had eight and one-half and five year delays respectively, the seventeen and twenty month delays were not "great."  Id. at 1014 (further suggesting that if the delays, which were only a few months longer than required to trigger the threshold presumption of prejudice "were sufficient as a matter of law to relieve the defendant of the burden of coming forward with any showing of actual prejudice, the presumption of prejudice would be virtually irrebuttable" and finding that the Supreme Court did not intend such a bright line rule).

Similar periods of negligently-caused delay have been held insufficient to excuse a defendant from showing actual prejudice.  E.g., United States v. Jackson, 473 F.3d 660, 667 (6th Cir. 2007) (nearly two-year delay between a defendant's indictment and his arrest, attributable to the government's negligence, did not waive actual prejudice prong); United States v. Gregory, 322 F.3d 1157, 1162-63 (9th Cir. 2003)  (twenty-two month delay; noting that while "no showing of prejudice is required when the delay is great and attributable to the government," "when the government has been negligent and the delay does not far exceed the minimum time required to trigger the full Barker inquiry, we must consider the amount of delay in relation to particularized prejudice") (internal quotation marks omitted); see also United States v. Serna-Villarreal, 352 F.3d 225, 232 (5th Cir. 2003) (indicating that actual prejudice generally required when period of delay is less than five years); but see United States v. Ingram, 446 F.3d 1332, 1339 (11th Cir. 2006) (finding a "two-year post-indictment delay intolerable" and presuming prejudice where the first three Barker factors weighed in the defendant's favor).

Actual prejudice may be shown in three ways:  "oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the accused's defense will be impaired."  Sutcliffe, 505 F.3d at 957 (internal quotation marks omitted).  Defendant first argues that as a

result of the delay, he will face the possibility of a consecutive sentence for the Oregon crimes. Notably, he offers no authority for this argument. I agree with the government that the sentencing options are unchanged as a result of the delay. The court will have the same options available at the sentencing on the Oregon charges as it did at the time defendant was sentenced in the Western District of Washington. The sentence for the Oregon charges may be run concurrently or consecutively, or partially so. The delay has no effect on sentencing.

Alternatively, defendant argues that the delay has caused him anxiety and has prejudiced his ability to mount a defense. As to the anxiety, he relies on health records from August 2011 and January 2012. Def's Exs. 105, 107. The August 2011 records reveal that while incarcerated in Florida, he was admitted to the local hospital after complaining of chest pain. He reported that he started to feel dizzy while playing cards in the sun. Def's Ex. 105. His cardiac workup was negative. Id. He was diagnosed with unspecified angina pectoris, placed on aspirin, and prescribed metoprolol succinate[8], to be taken daily for 180 days. Def's Ex. 105 at p. 14. A few days later, he reported that he was exercising and working without complaint. Id.

In January 2012, he complained of being unable to take a deep breath and feeling like something was pushing on his chest. Def's Ex. 105. He was seen by medical staff at the Columbia County Jail and told to inform medical staff of any new symptoms. Id. The next day, he reported that the heaviness in his chest had resolved and he was feeling better. Id. Defendant also submits what appears to be a printout of a test, most likely an EKG, performed in February 2012 and which indicates that the results were normal. Id.

---

[8] This medication is a "beta blocker," used to treat high blood pressure and angina. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682864.html

Defendant's evidence does not establish that the delay in returning him to Oregon to be arraigned on the Oregon charges caused any adverse effect on his health. First, the records fail to show that he mentioned the Oregon charges in particular or stress or anxiety generally to any health practitioner. Second, for an obese, forty-five year old male with a family history of heart disease as reflected in the medical records, there are any number of causes of chest pain unrelated to anxiety. Third, if the delay caused his health issues, one would expect the symptoms to have arisen earlier than August 2011. According to defendant, he learned that the Oregon charges were still pending in January 2011, yet the health records in evidence show no health concerns until eight months later. These records are insufficient to demonstrate that the delay has caused defendant anxiety.

Finally, defendant argues that the delay has impaired his defense because he "had an exculpatory eye witness and alibi witness named Leslie, last name unknown, who spent intimate time with him prior to arrest on these charges [and that] [s]he is now missing and cannot be located." Def's Reply to Gov't Resp. re: Mot. Based on Speedy Trial Violations at p. 3. Defendant offers no evidence about "Leslie."[9]

I agree with the government that defendant's argument is not persuasive. Defendant gives no indication that absent delay, he had the ability to locate a person whose last name he does not appear to know. The description of the witness is limited to the witness's first name, making it difficult to see how locating the witness would have been possible at any time. Additionally,

---

[9] The government's witnesses provided the following information about "Leslie": Wood testified that he learned when interviewing defendant's niece that the niece had met a female named Leslie who had been traveling with defendant and Treat testified that defendant stated that Leslie knew nothing about the robberies because he had not told her what he was doing.

defendant includes no facts showing how the witness's testimony is relevant to his defense. Instead, he simply asserts in conclusory fashion, in a memorandum, that she has exculpatory and alibi information.  Thus, any prejudice resulting from the delay as to this witness would be speculative.  Moreover, defendant's full confession to the robberies, which is properly considered as explained below, is inconsistent with his argument that the delay has prejudiced his ability to locate this allegedly exculpatory witness.  The record does not establish that the delay caused any impairment to defendant's defense.

Considering all of the factors, defendant fails to show that his constitutional right to a speedy trial has been violated.  While the delay has been long, the factors generally favor the government.  As noted, one-half of the delay is defendant's responsibility.  The remaining period of the delay weighs slightly in favor of defendant or is neutral.  On the issue of whether defendant asserted his right to a speedy trial, the facts are neutral or weigh slightly in favor of the government because initially, defendant waived his speedy trial rights.  Then, after the conclusion of the Washington case, assuming defendant was unaware of the Oregon charges until January 2011, he still made no effort for an additional six months to ascertain the status of his case.  Finally, the fourth factor weighs heavily in favor of the government because defendant has not been prejudiced as a result of the delay.  Defendant's motion to dismiss for constitutional speedy trial violations is denied.

III.  Motion to Suppress

Defendant makes four separate arguments in support of his motion to suppress statements he made to law enforcement officers after his arrest.  He contends his rights were violated by (1) failing to honor his request for an attorney; (2) failing to "scrupulously honor" his twice-

19 - OPINION & ORDER

expressed desire to remain silent; (3) waiting to interrogate him for nearly ten hours; and (4) coercing him into making statements by threatening his family.  I address the arguments in turn.

A.  Request for Counsel

A suspect subject to custodial interrogation has a Fifth Amendment right to consult with an attorney, and the police must explain this right prior to questioning.  Miranda v. Arizona, 384 U.S. 436, 469–473 (1966).  When an accused invokes his right to have counsel present during custodial interrogation, he may not be subjected to further questioning by the authorities until a lawyer has been made available or the suspect himself reinitiates conversation.  Edwards v. Arizona, 451 U.S. 477, 484–485 (1981).

Defendant testified at the June 26, 2012 hearing that when he was first arrested by police at the Shilo Inn in Tacoma, he was read his Miranda rights before being placed in the patrol car.  He testified that he responded that he fully understood his rights and that he asked for an attorney or a bunk to sleep in.  He further stated that upon being booked into the Pierce County Jail, he was read his rights again and refused to sign an advice of rights form.  He testified that he again asked for an attorney or a bunk.  At this point, he assumed he would be given an attorney and arraigned.  Instead, about mid-morning, he was interviewed by law enforcement officers and eventually confessed to committing several bank robberies.

Tacoma Police Officer Jason Mills testified that at 12:30 a.m. on November 21, 2007, he received a call regarding a suspect wanted on an out-of-state warrant who was at the Shilo Inn.  He was told the suspect was connected to a violent crime and could be armed and dangerous.  Several officers went to the Shilo Inn.  Mills was in uniform and wearing a badge.  The officers were told that the suspect had just been in the lobby but had gone to his room.  Some of the

officers went to the back of the hotel.  Mills went to the identified room, which was on the

ground floor.  A person matching defendant's description was in the room.  Defendant was awake

and dressed.  The arrest was very orderly.  Defendant was not assaultive or argumentative.

Mills advised defendant of his rights using a prepared card.  He recalled that he read the

statement to defendant fully.  See Govt's Ex. 5 (copy of advisement of rights card identical to one

used by Mills).  Mills testified that in response, defendant said nothing and remained silent.

Defendant made no statements after Mills advised him of his rights.  Next, Mills conducted a

search of defendant and found a packet of methamphetamine.  Mills's involvement with

defendant ended at that point as other officers transported defendant to jail.

Tacoma Police Officer Stanley James also participated in defendant's arrest.  He stated

that at the time of the arrest, defendant was cooperative and did not appear to be under the

influence of any drugs or alcohol.  Defendant appeared to be suffering from no physical

disabilities.  James's testimony corroborated Mills's testimony, including that he believed Mills

had already advised defendant of his rights and that defendant made no statements in response.

James also knew that Mills had found methamphetamine on defendant.

James and another officer transported defendant in a patrol car to the Pierce County Jail

where they arrived at approximately 1:15 a.m.  Defendant was searched again after arriving at the

jail and more methamphetamine was found.  James completed a booking form, indicating that

defendant was being held because of the California warrant and narcotics possession.

Defendant was given a written "Advisement of Rights" form.  Gov't Ex. 1.  It is dated

November 21, 2007.  Id.  The time is noted to be 1:30 a.m.  James is listed as the officer.  The

form includes an advisement of rights, with five rights separately delineated so that defendant

was aware that he had the right to remain silent, that statements he might make could be used against him, that he had the right to counsel of his choice and to have counsel present before and during questioning, that an attorney would be appointed if defendant could not afford one, and that he could stop answering questions or ask for an attorney at any time.  Id.  This list is followed by two questions to be asked by the officer:  (1) whether the recipient of the advisement understands each of the rights which have been explained; and (2) having been made fully aware of the rights, does the recipient whish to answer questions now.  Id.  Following the questions is a place for the signature of the recipient of the advisement.  Id.  According to James, defendant returned the form to James without signing it.  Defendant made no statement and did not ask for an attorney.  James filled in the signature line with the word "Refused."  Id.

Later, after law enforcement officials realized that defendant was a suspect in several bank robberies, he was interviewed by Pierce County Sheriff's Department Detective Denny Wood as well as FBI agent Donald Treat and two other detectives.  Wood testified that the four interviewing law enforcement officers wore plain clothes.  They interviewed defendant at approximately 10:45 a.m. and began with an advisement of his Miranda rights.  Gov't Ex. 2.  The advisement of rights form is dated November 21, 2007, and shows an initial time of 10:58 a.m. Id.  Wood read the form to defendant "verbatim," and asked defendant to respond "yes" or "no" as to whether he understood each right.  Wood described defendant as calm and not frustrated. Defendant asked no questions and did not ask for an attorney.  Wood testified that defendant himself wrote the word "yes" in response to the two questions at the bottom of the form inquiring if he understood his rights and having been made aware of them, if he voluntarily wished to answer questions now.  See also id.  Defendant signed the form at that time as well.  Id.

22 - OPINION & ORDER

According to Wood, at the end of the initial interview, defendant remarked that he was surprised there had been no recorded statement.  In response, law enforcement officers took a recorded statement from defendant, beginning with a re-advisement of his rights using the same form.  The form shows a second time of 12:37 p.m., reflecting the second time this particular advice of rights was given.  Wood testified that earlier, defendant answered the two questions in writing and signed the form, but upon being re-advised during the recorded portion of the interview, defendant answered the questions orally.  Government Exhibit 4 is a transcription of the recorded interview.  The transcript shows that at the start of the interview, Wood states that he is going to advise defendant of his Miranda rights "one more time" with "the same form I used last time."  Gov't Ex. 4 at p. 1.  He points to where defendant previously signed the form.  Id. Wood then goes through each right and asks if defendant understands.  Id.  One of the rights explained is the right to have counsel and to have counsel present before and during questioning. Id.  Defendant responded orally that he understood each right and that being made fully aware of his rights, he voluntarily wished to answer questions now.  Id. at pp. 1-2.  He also acknowledged that it was his signature on the form.  Id.

Treat also testified that he recalled no statements by defendant invoking his right to counsel or his right to remain silent.

Contrary to Wood's testimony, defendant testified that when asked if he understood his rights, he did not respond in the affirmative.  He stated that he responded that he had nothing to say.  However, he also admitted that he did write the words "yes" after each of the two questions on the advisement form Wood had read from and that he signed the form.

I find defendant's testimony that he requested an attorney at the time of arrest and again at

23 - OPINION & ORDER

the Pierce County Jail, to be not credible.  The testimony of the law enforcement officers was

consistent in that each time defendant received an advice of rights, he did not request an attorney.

James corroborated Mill's testimony that at the initial arrest, defendant was silent after Mills read

defendant his rights.   Similarly, Treat corroborated Wood's testimony that defendant made no

request for an attorney.  Additionally, the notation of "refused" by James after defendant was

advised of his rights during booking at the jail is consistent with a suspect who said nothing in

response to the advisement of rights unlike a suspect who affirmatively requested an attorney.  In

contrast, defendant's credibility is undermined by his extensive criminal history, including

"twenty-nine different arrest cycles" beginning at age seventeen, including convictions for violent

crimes, and the fact that he has more of an incentive to lie than the officers.

Because defendant did not request counsel, the questioning by Wood and other detectives

beginning at 10:45 a.m. did not violate defendant's constitutional rights.

B.  Honoring Request to Remain Silent

In Michigan v. Mosley, 423 U.S. 96, 104 (1975), the Supreme Court explained that "the

admissibility of statements obtained after the person in custody has decided to remain silent

depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'"

In United States v. Hsu, 852 F.2d 407, 409–10 (9th Cir. 1988), the Ninth Circuit recognized that

Mosley created a "totality of the circumstances approach" to determining whether a defendant's

right to remain silent, once invoked, was scrupulously honored:

> Mosley envisioned an inquiry into all of the relevant facts to determine whether
> the suspect's rights have been respected.  Among the factors to which the Court
> looked in that case were the amount of time that elapsed between interrogations,
> the provision of fresh warnings, the scope of the second interrogation, and the
> zealousness of officers in pursuing questioning after the suspect has asserted the

right to silence.  At no time, however, did the Court suggest that these factors
were exhaustive, nor did it imply that a finding as to one of the enumerated factors
. . . would forestall the more general inquiry into whether, in view of all relevant
circumstances, the police "scrupulously honored" the right to cut off questioning

Hsu, 852 F.2d at 410.

A refusal to sign a waiver form may indicate that a defendant is invoking his right to

silence, but the refusal alone does not render a waiver of Miranda rights invalid.  As the Ninth

Circuit explained in a 2008 case:

> In [United States v.] Heldt, [745 F.2d 1275 (9th Cir. 1984)], the defendant
> was read his Miranda rights and provided with a waiver form, but told his
> interrogator that he "understood his rights, but did not wish to waive them, and
> that he . . . did not wish to answer questions." Id. at 1277 (emphasis added).  We
> concluded that Heldt's refusal to sign the form was important evidence supporting
> the finding that he did not waive his rights.  Id. at 1277–78.  Yet as we later
> explained in United States v. Andaverde, 64 F.3d 1305 (1995), a defendant's
> refusal to sign the waiver form alone does not render his waiver invalid.  Id. at
> 1314 (citations omitted).  Rather, "a refusal to sign a waiver form is an 'indication'
> that the defendant is invoking his right to silence which casts 'initial doubt' on the
> government's waiver claim." Id. at 1313 (quoting Heldt, 745 F.2d at 1277)
> (emphasis added).  Additional evidence is necessary to confirm that initial doubt.
> For example, in Heldt, "the defendant verbally refused to answer questions and
> was 'exhorted' to answer by police." Id. (quoting Heldt, 745 F.2d at 1277–78)
> (emphasis added).

United States v. Shi, 525 F.3d 709, 729 (9th Cir. 2008).

If a defendant's invocation of his Miranda rights is ambiguous or equivocal, the

interrogating official has a duty to clarify the defendant's response to Miranda warnings before

commencing interrogation.  United States v. Rodriguez, 518 F.3d 1072, 1080 (9th Cir. 2008).

For the reasons explained above, I credit the officers' testimony regarding the advisements

of rights given to defendant and defendant's responses to those advisements.  Accordingly,

defendant did not invoke his right to remain silent at the time of arrest when Mills advised him of

his rights.

Defendant's "refusal" to sign the advice of rights given to him at the jail at 1:30 a.m. was, at best, an equivocal invocation of his <u>Miranda</u> rights because defendant himself said nothing and simply handed the form back to James.  Defendant made no contemporaneous statement that he refused to talk or that he did not wish to waive his rights.  James characterized defendant's silence as a "refusal" to sign the form.  At that point, the police did not intend to question the defendant and no interrogation took place.

At the time James transported defendant and assisted in his booking in the Pierce County Jail, James did not know that defendant was a suspect in any recent bank robberies.  But, James testified, soon after defendant was placed in the Pierce County Jail, James realized that defendant may be a suspect in recent bank robberies occurring in the area.  He then sent an email to Tacoma Police Department Detective Larry Anders.

Wood testified that he received a call from Anders at 7:30 a.m. on November 21, 2007 telling him that a suspect in a series of bank robberies had been arrested.  Wood looked at defendant's booking photograph and compared it to a "Crime Stoppers" photo of the suspect. They appeared the same to him.  Wood contacted Treat.  At that point, Wood and other officers went to interview defendant's family members who remained at the Shilo Inn.  Afterwards, they proceeded to the jail where they began the interview of defendant described above.

To the extent defendant invoked his rights at the time he was booked into the Pierce County Jail, they were not violated.  The facts show that several hours later, entirely separate law enforcement officers from entirely different law enforcement agencies began investigating defendant for an entirely different crime.  Before starting any questioning of defendant, Wood

carefully went through each right with defendant and had defendant separately acknowledge his understanding of each right. With this colloquy, Wood did more than merely re-read the rights form to defendant. Instead, he made sure that defendant knew his rights and voluntarily relinquished them. Wood's new advisement of rights with a separate confirmation that defendant understood each and every one of the rights read to him, is appropriately viewed as a "clarification" of defendant's earlier silence regarding his Miranda rights. See United States v. Fouche, 833 F.2d 1284, 1287-89 (9th Cir. 1987) (officer properly clarified defendant's desires by explaining rights in detail and asking if the defendant understood what the rights meant and what it meant to waive them). Law enforcement officials did not violate defendant's right to remain silent.

C. Length of Time Between Arrest and Interrogation

"[A]n arrested person's confession is inadmissible if given after an unreasonable delay in bringing him before a judge." Corley v. United States, 556 U.S. 303, 306 (2009) (citing McNabb v. United States, 318 U.S. 332 (1943) and Mallory v. United States, 354 U.S. 449 (1957)). In response to the McNabb–Mallory rule, Congress enacted 18 U.S.C. § 3501(c), which provides a six-hour "safe harbor" period during which a confession will not be deemed inadmissible solely because of delay in presentment to a magistrate. United States v. Liera, 585 F.3d 1237, 1242 (9th Cir. 2009). Accordingly, under section 3501(c),

> "'[A] district court . . . must find whether the defendant confessed within six hours of arrest (unless a longer delay was reasonable considering the means of transportation and the distance to be traveled to the nearest available magistrate). If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was made voluntarily and the weight to be given it is left to the jury. If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the McNabb–Mallory

cases, and if it was, the confession is to be suppressed.'"

United States v. Valenzuela-Espinoza, 664 F.3d 1265, 1269 (9th Cir. 2011) (quoting Corley, 556 U.S. at 322).

Defendant argues that because he was interrogated and confessed more than six hours after his arrest, and before presentment to a magistrate judge, his "right to be interrogated within six hours pursuant to 18 U.S.C. 3501 was violated and the remedy is suppression." Def's Mem. at p. 6. I reject this argument because section 3501(c) "creates a six-hour 'safe harbor' between the commencement of detention on a federal charge and appearance before a magistrate judge during which a voluntary confession is admissible." United States v. Michaud, 268 F.3d 728, 734 (9th Cir. 2001) (emphasis added). Defendant was detained on non-federal charges of a California warrant and drug possession. He was not detained on federal charges until after his interview and confession.

The relevant time period can commence with an arrest on a state charge if there is proof that "'state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate [her] in violation of [her] right to a prompt federal presentment.'" Id. (quoting United States v. Alvarez–Sanchez, 511 U.S. 350, 359 (1994) (holding that a person questioned by a federal officer while being held on state charges was outside any protection afforded by 18 U.S.C. § 3501(c))) (brackets in Michaud).

Defendant contends that there is no question of a collaborative effort between federal authorities and local law enforcement and the only issue is whether there was a deliberate intent to deprive defendant of his federal procedural rights. He notes that he was arrested by local law enforcement less than eleven hours after the final bank robbery and that those officers knew

"nearly right away" that he was wanted in California for a bank robbery parole violation and that he matched the description of the photos on the "Crime Stoppers" posters. He states that although the FBI was notified first thing in the morning, they delayed interrogating him until after they went to the Shilo Inn. Finally, he states, nearly ten hours after his arrest, he was interrogated about the bank robberies.

The uncontroverted testimony of the arresting law enforcement officers was that they went to the Shilo Inn because of the outstanding California warrant and that defendant was placed in custody because of the warrant and the methamphetamine found in his possession upon arrest. The local law enforcement officers did not arrest defendant for his role in the recently-committed bank robberies in Washington or Oregon. James's uncontradicted testimony is that he did not make the connection between defendant and the recent bank robberies until after defendant was booked in the Pierce County Jail. No federal law enforcement officer was notified that defendant was in custody until many hours later, sometime after Wood learned about defendant in a call from Anders at 7:30 a.m. There is no evidence of collusion between state and federal law enforcement officials in effecting the arrest. This motion is denied.

D. Coercion

Finally, defendant argues that his confession was obtained as a result of coercion. The burden is on the government to prove, by a preponderance of the evidence, that a confession was voluntarily made. United States v. Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003). In assessing the totality of the circumstances, the "court should consider the length and location of the interrogation, the maturity and education of the defendant, the physical and mental condition of the defendant, and whether the defendant was properly advised of his Miranda rights." United

States v. Pulido-Aguilar, No. 3:10–cr–00142–KI, 2011 WL 2470108, at *10 (D. Or. June 20, 2011) (citing Withrow v. Williams, 507 U.S. 680, 693-94 (1993)).

Threats to arrest a defendant's family members may constitute impermissible coercion rendering a confession involuntary.  See United States v. Moreno, 891 F.2d 247, 249-50 (9th Cir. 1989) (defendant was entitled to a hearing to determine voluntariness, under totality of circumstances, of her confession to involvement in narcotics activity where that confession was obtained after defendant was separated from her baby and saw her sixteen-year old daughter crying and in handcuffs); see also United States v. Vargas-Saenz, No. 1:10–cr–30069–PA, 2011 WL 2559613, at *2-3 (D. Or. June 28, 2011) (threatening to send immigration agents to arrest and deport defendant's parents and making statements such as "pity your father without money, without work and in Mexico, and with your daughter there, and not even coming back" rendered confession involuntary); United States v. Pena-Mendez, No. 3:08-cr-332-HA, 2009 WL 1741582, at *2 (D. Or. June 17, 2009) (threats of physical violence to self or family can overbear a defendant's will and make his or her statement involuntary).

Wood testified that after learning of defendant's arrest, he contacted Treat and the other detectives and that they went to the Shilo Inn to interview defendant's niece and her husband who were there with their children and two of defendant's children.  Wood spoke with Janay Litt, defendant's niece, who was cooperative and not hesitant to talk.  She told Wood that defendant had visited her in Puyallip a couple of times and that she had visited him in Vancouver at their mother's home.   At least one of the recent bank robberies occurred in Puyallip, not far from where Litt lived.  Litt was not a suspect.

Treat testified that he interviewed Joseph Auden, Litt's husband.  Auden was cooperative

and spoke freely to Treat.  Auden was not a suspect and neither he, his vehicle, nor the hotel room were searched.

Defendant testified that during the subsequent interview with Wood, Treat, and the other detectives, Treat identified himself as an FBI agent and told defendant he had photographs of the robbery suspect.  According to defendant, Treat threatened defendant by stating that if defendant did not admit to being the man in the photographs, law enforcement would search Litt's home and ruin their Thanksgiving which was only two days away.  Defendant testified that the officers said "we have your family."  He believed his family was being detained.

Defendant said that after he thought about what Treat might do to his family, he confessed to being the man in the photographs.  He stated that before he would fully participate in the interview, however, he wanted to be reassured about his family.  In response, he stated that either Treat or Wood called Litt who asked to talk to defendant.  Litt then spoke to defendant and told him that his family was okay.  Defendant then gave a full confession.

Wood confirmed that defendant was concerned about his family, but, he also testified that during the interview, defendant was not under the influence of any drugs, he was "up and awake," and was cautious and thoughtful in his answers.  He was intelligent and well-spoken.  His concern about his family was directed to making sure the officers knew that his family was not involved in the robberies.

Treat confirmed that in response to Wood's questions about defendant's family's involvement, defendant was very clear that his family was not involved.  Law enforcement officers were, however, very concerned about an accomplice, specifically a driver.  Thus, they did tell defendant that they could, at a later time, seek to obtain a search warrant for Litt's and

Auden's house if they could not confirm from the interview that no family member was involved. But, Treat denied that defendant was told that the house would be searched if defendant failed to admit that he committed the robberies. Treat also denied that defendant was told that his family members had been detained. He further denied that he allowed defendant to call Litt. No search of the home ever occurred.

Looking at the totality of the circumstances, I conclude that defendant's confession was voluntary and not the product of impermissible coercion. The statements made to defendant regarding his family members occurred in the context of determining whether defendant acted alone or had an accomplice and if the latter, who that accomplice was. Defendant was not under the influence of any drugs or alcohol and was suffering from no physical or mental impairment at the time of his confession.

For the reasons previously explained, I credit the testimony of the officers regarding the statements made during the interview. Wood's and Treat's testimony is consistent with each other. There were no promises or threats; rather, they indicated that depending on the outcome of the interview, they may seek to search defendant's family's home. Providing such information is not coercion. Nothing said or done by law enforcement officers was sufficient to overcome defendant's voluntary statements. I deny this part of the motion.

/ / /

/ / /

/ / /

/ / /

/ / /

32 - OPINION & ORDER

CONCLUSION

Defendant's motion to dismiss based on Speedy Trial Act violations [13] is denied;

defendant's motion to dismiss based on constitutional speedy trial and other violations [37] is

denied; defendant's motion to suppress [38] is denied.

IT IS SO ORDERED.

Dated this 26th day of July , 2012

Marco A. Hernandez
United States District Judge

33 - OPINION & ORDER